**ORAL ARGUMENT NOT YET SCHEDULED**

No. 22-1163 (Consolidated with No. 22-1180)

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

HOSPITAL MENONITA DE GUAYAMA, INC.,

Petitioner/Cross-Respondent,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent/Cross Petitioner.

_____

Petition for Review from a Decision and Order of
the National Labor Relations Board, 371 NLRB No. 108 (June 28, 2022)

_____

**OPENING BRIEF OF PETITIONER**

_____

*s/Ángel Muñoz Noya, Esq.*
Bar No. 46830
amunoz@sbsmnlaw.com
*s/ Gerardo De Jesús, Esq.*
**SÁNCHEZ-BETANCES, SIFRE
& MUÑOZ-NOYA**
33 Calle Bolivia, Suite 500
San Juan, Puerto Rico 00917
Telephone: (787) 756-7880
Facsimile: (787) 753-6580

*s/Patrick M. Muldowney, Esq.*
Patrick M. Muldowney, Esq.
Florida Bar No. 978396
pmuldowney@bakerlaw.com
**BAKER & HOSTETLER LLP**
200 South Orange Avenue, Ste. 2300
P.O. Box 112
Orlando, FL 32802-0112
Telephone: (407) 649-4000
Facsimile: (407) 841-0168

*Attorneys for Petitioner/Cross-Respondent*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Petitioner certifies as follows:

## I.    PARTIES AND *AMICI.*

### A.    <u>Appearing Before the National Labor Relations Board</u>

1.    Charging Party: Unidad Laboral de Enfermeras(os) y Empleados de la Salud

2.    Respondent: Hospital Menonita de Guayama, Inc.

3.    Government: Counsel for the General Counsel, National Labor Relations Board, Region 12

### B.    <u>Appearing Before this Court</u>

1.    Petitioner/Cross-Respondent: Hospital Menonita de Guayama, Inc.

2.    Respondent/Cross-Petitioner: National Labor Relations Board

### C.    ***Amici Curiae***

None at this time.

## II.    RULINGS UNDER REVIEW

*Hospital Menonita de Guayama, Inc. and Unidad Laboral de Enfermeras(os) y Empleados de la Salud,* 371 NLRB 108 (June 28, 2022) to the extent that the Board

i

decided that Petitioner violated sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act.[1]

## III.    RELATED CASES

There are no known related cases pending in any other United States Court of Appeals or any other court in the District of Columbia.

---

[1] Petitioner is not seeking review of the ruling in the Decision dismissing the allegations that: (1) Petitioner did not violate the Act by setting initial terms and conditions of employment without giving the Union notice and opportunity to bargain; or (2) the September-October 2017 shift change for Petitioner's registered nurses occurred outside of the Section (10)(b) period. Moreover, Petitioner is not seeking review of the fact that the Board found it unnecessary to rely on the Judge's determination to use certain facts to "shed light" on later events, or that the Board focused on the period alleged in the complaint that Petitioner's failure to bargain began on February 7, 2018.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Hospital Menonita de Guayama, Inc., is a non-profit corporation. Hospital Menonita certifies that it has a parent corporation named Mennonite General Hospital, Inc., which is also a non-profit corporation, and no publicly held corporation has a 10% or greatest interest in Hospital Menonita de Guayama, Inc., or Mennonite General Hospital, Inc.

Respectfully submitted,

*s/ Patrick M. Muldowney*
Patrick M. Muldowney, Esq.
pmuldowney@bakerlaw.com
**BAKER @ HOSTETLER LLP**
200 South Orange Avenue, Ste. 2300
P.O. Box 112
Orlando, FL 32802-0112
Telephone: (407) 649-4000
Facsimile: (407) 841-0168

Ángel Muñoz Noya, Esq.
Bar No. 46830
amunoz@sbsmnlaw.com
**SÁNCHEZ-BETANCES, SIFRE
& MUÑOZ-NOYA**
33 Calle Bolivia, Suite 500
San Juan, Puerto Rico 00917
Tel.: 787-756-7880
Fax: 787-753-6580

*Attorneys for Petitioner/Cross-Respondent*

iii

## TABLE OF CONTENTS

**CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES** ........ i

    **I.   PARTIES AND *AMICI***.................................................................... i

    **II.  RULINGS UNDER REVIEW** ............................................. i

    **III.  RELATED CASES** ..................................................... ii

**CORPORATE DISCLOSURE STATEMENT**..................................................... iii

**TABLE OF CONTENTS** ........................................................................... iviii

**TABLE OF AUTHORITIES** ...................................................... vii

**GLOSSARY OF ABBREVIATIONS** ................................................. iix

**JURISDICTIONAL STATEMENT**....................................................1

**STATEMENT OF THE ISSUES**........................................................1

**STATEMENT OF THE CASE** ........................................................3

    **A.   Petitioner's Acquisition of the Hospital**…………………..3

    **B.   Checks Issued in Appreciation for Work During Hurricane Maria**………………………………………..4

    **C.   Petitioner's Lawful Withdrawal of Recognition from the Union**…………………………………………………5

    **D.   Petitioner's Lawful Changes to Terms and Conditions of Employment**………………………….………………7

**SUMMARY OF ARGUMENT**.........................................................10

**STANDING**.................................................................................11

**STANDARD OF REVIEW** ..........................................................11

**ARGUMENT**..............................................................................11

I.  THE BOARD INAPPROPRIATELY APPLIED THE SUCCESSOR BAR DOCTRINE (STATEMENT OF ISSUES 1-3, 5-8)……………………………………………11

   A.  **The Board's Vacillating Application of the Successor Bar Is Not Entitled to Deference**………………………………12

   B.  **The Board's Application Of The Successor Bar Is Contrary to Supreme Court Precedent And The Goals Of The Act**..……………………………………15

II. PETITIONER DID NOT VIOLATE SECTIONS 8(A)(1), 8(A)(5), OR 8(D) OF THE ACT (STATEMENT OF ISSUES NO. 4, 9, 10)……………………………………18

   A.  **Petitioner Did Not Refuse to Bargain With the Union**……..19

   B.  **Petitioner Did Not Unlawfully Change Terms And Conditions Of Employment**……………………………20

        1.  *The Parties Reached Impasse Regarding Implementation Of A 12-Hour Shift For the RN Unit*…………………………………..21

        2.  *Petitioner Did Not Violate The Act By Eliminating The Employees' Portion Of Their Health Insurance Premium*…………………………...…………22

        3.  *Petitioner Did Not Violate The Act By Providing A Statutorily Mandated Uniform Allowance*………….23

        4.  *Petitioner's Implementation of the Employee Handbook was within the Hospital's Statutory and Contractual Rights*……………………………24

        5.  *Petitioner's Decision To Raise The Wages For Technicians Did Not Violate The Act*…………….24

   C.  **Petitioner Complied With Whatever Requirement It May Have Had To Respond To The Union's Request**

**For Information**……………………………………………..25

D.  **The NLRB Erred In Finding Appreciation Payments To Employees That Worked Overnight During Hurricane Maria Violated Section 8(A)(1) And (5) Of The Act**…………………………………………………26

E.  **The Board Erred In Finding Petitioner Did Not Discharge Its Duty To Bargain**………………………………………….27

III.  **THE NLRB ERRED BY IMPOSING EXTRAORDINARY REMEDIES (STATEMENT OF ISSUES NUMBER 11, 12 & 13**…………………………………28

**CONCLUSION**..................................................................................31

**CERTIFICATE OF COMPLIANCE** ...............................................33

**CERTIFICATE OF SERVICE** ........................................................34

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*AMF Bowling Co. v. N.L.R.B.*,
63 F.3d 1293 (4th Cir. 1995) ......................................................21

*Bath Marine Draftsmen's Ass'n v. NLRB*,
475 F.3d 14 (1st Cir. 2007)........................................................12

*BPH & Co., Inc. v. NLRB*,
333 F.3d 213 (D.C. Cir. 2003).....................................................12

*Crystal Springs Shirt Corp*,
229 NLRB No. 10 (1977) ...........................................................28

*Fall River Dyeing & Finishing Corp. v. NLRB*,
482 U.S. 27 (1987)........................................................12, 16, 18

*Harley-Davidson Transportation Co.*,
273 NLRB 1531 (1985) ..............................................................14

*Landmark Int'l Trucks, Inc.,* 257 NLRB 1375 (1981).............................13

*Landmark Int'l Trucks, Inc v. NLRB*,
699 F.2d 815 (6th Cir. 1983) ......................................................13

*Lechmere, Inc. v. NLRB*,
502 US 527 (1992)....................................................................18

*Local 777, Democratic Union Org. Comm. v. NLRB*,
603 F.2d 862 (D.C. Cir. 1978).....................................................12

*MV Transportation*,
337 NLRB 770 (2002) ...............................................................14

*N.L.R.B. v. Acme Indus. Co.*,
385 U.S. 432 (1967)..................................................................25

*Phelps Dodge Min. Co., Tyrone Branch v. N.L.R.B.*,
22 F.3d 1493 (10th Cir. 1994) .....................................................26

*S. Maryland Hosp. Ctr. v. N.L.R.B.*,
   801 F.2d 666 (4th Cir. 1986) ...................................................................27

*S&F Market Street Healthcare LLC v. NLRB*,
   570 F.3d 354 (D.C. Cir. 2009)..................................................................15

*Sierra Club v. EPA*,
   292 F.3d 895 (D.C. Cir. 2002)..................................................................11

*Southern Moldings,* 219 NLRB 119 (1975)............................................13

*St. Elizabeth Manor, Inc.*,
   329 NLRB 341 (1999) ..............................................................................14

*Taft Broad. Co., Wdaf Am-Fm TV*,
   163 NLRB 475 (1967) ..............................................................................22

*TruServ Corp. v. N.L.R.B.*,
   254 F.3d 1105 (D.C. Cir. 2001), *as amended* (Aug. 17, 2001)...........21

*UGL-UNICCO Service Co.*,
   357 NLRB 801 (2011) .............................................1, 2, 12, 14, 16, 17

**Statutes**

29 U.S.C. § 151 ........................................................................................1

29 U.S.C. § 157 ......................................................................................17

29 U.S.C. § 158(a)(1)........................................................................18, 21

29 U.S.C. § 158(a)(5)........................................................................18, 21

29 U.S.C. § 160(f)....................................................................................1

29 U.S.C. § 160(a) ...................................................................................1

29 U.S.C. § 160(e) ...................................................................................1

29 L.P.R.A § 250e..................................................................................24

## GLOSSARY OF ABBREVIATIONS

| Term | Abbreviations |
|------|---------------|
| Administrative Law Judge | ALJ |
| ALJ Decision | ALJD |
| Counsel for the General Counsel | CGC |
| Hospital Menonita de Guayama, Inc. | Petitioner |
| Hospital Menonita de Guayama | Hospital |
| Hospital San Lucas Guayama | San Lucas |
| Joint Exhibit | J.E. |
| Joint Motion and Stipulation of Documents and Facts | St. |
| Mennonite General Hospital, Inc. | MGH |
| National Labor Relations Act (29 U.S.C. §151 *et seq.*) | NLRA or Act |
| National Labor Relations Board | NLRB or Board |
| NLRB's June 28, 2022 Decision and Order, reported at 371 NLRB No. 108 | Decision   or   Dec. |
| Rejected Exhibit | R.E. |
| Transcript of Hearing | Tr. |
| Unidad Laboral de Enfermeras(os) y Empleados de la Salud | Union |

## JURISDICTIONAL STATEMENT

The NLRB had jurisdiction over the underlying action pursuant to Section 10(a) of the Act. 29 U.S.C. §§ 151, 160(a). This Court has jurisdiction under Section 10(e) and (f) of the Act. 29 U.S.C. § 160(e) and (f). The Board's June 28, 2022, Decision is a final order granting relief in part on the CGC's claims. The Hospital, as an "aggrieved party," timely petitioned for review on July 15, 2022. The NLRB filed a cross-application for enforcement on August 3, 2022, pursuant to 29 USC § 160(e), which this Court directed be consolidated with the Hospital's Petition for Review and treated as a Cross-Appeal.

## STATEMENT OF THE ISSUES

Petitioner raises 13 issues for this Court's review: *(1)* Whether Petitioner unlawfully withdrew recognition from the Union, who represented five separate bargaining units, before any negotiations had taken place; *(2)* Whether the NLRB erred in concluding that the withdrawals of recognition were unlawful based on the successor bar doctrine as set forth in *UGL-UNICCO Service Co.,* 357 NLRB 801 (2011); *(3)* Whether the NLRB erred in rejecting Petitioner's evidence proffered to show that a majority of its employees no longer supported the Union; *(4)* Whether the NLRB erred in finding that Petitioner violated Section 8(a)(5) and (1) of the Act by failing and refusing to bargain with the Union over collective-bargaining agreements for the five units, unilaterally changing its employees' terms and

conditions of employment, and failing to respond to the Union's request for information relevant to its bargaining duties; *(5)* Whether the successor bar doctrine as adopted by the Board in *UGL-UNICCO Service Co.,* 357 NLRB 801 (2011), is contrary to Supreme Court precedent; *(6)* Whether the successor bar doctrine as adopted by the Board in *UGL-UNICCO Service Co.,* imposes an unwarranted restriction on employees' Section 7 rights under the Act; *(7)* Whether the Union in successorship situations enjoys a rebuttable presumption of majority status only; *(8)* Whether the NLRB erred by not remanding the allegations that Petitioner unlawfully withdrew recognition from the Union to the administrative law judge to determine whether the withdrawals were supported by untainted evidence that over 50 percent of the employees in each unit no longer wished to be represented by the Union; *(9)* Whether the NLRB erred in finding that the November 22, 2017 certificate and $150.00 checks distributed by the Hospital to employees in the five units that had worked overnight during the passing of Hurricane Maria violated Section 8(a) 5 and 1 of the Act;  *(10)* Whether the NLRB erred in finding that Petitioner did not discharge its Section 8(d) duty to bargain by conditioning an in-person meeting upon the submission of written proposals and delaying bargaining after the Union had submitted its proposals for the bargaining units; *(11)* Whether the NLRB erred in imposing a remedy of a bargaining order that requires bargaining sessions between Petitioner and the Union to be held for a minimum of 15 hours per week; *(12)*

Whether the NLRB erred in imposing a remedy of a bargaining order that requires Petitioner to submit to the Board written bargaining progress reports every 30 days with copy to the Union; and *(13)* Whether the NLRB erred in imposing a remedy that requires Petitioner to distribute a notice to employees by electronic mail.

## STATEMENT OF THE CASE

**A.    Petitioner's Acquisition Of The Hospital.**   Petitioner purchased the Hospital's assets from San Lucas on September 12, 2017, and assumed operations on September 13, 2017. (JA1559-1679). On September 13, the Union requested that Petitioner recognize it as the representative of all collective bargaining units. (JA978-79). On September 18 and 19, Waleska Rodriguez, Petitioner's Human Resource Director, unsuccessfully attempted to respond to the Union's request. (JA980-85).  On September 19 and 20, Maria, a category 5 hurricane, struck Puerto Rico, devastating the island's infrastructure. (JA734 ¶ 40). The Governor declared a state of emergency and established a mandatory curfew from 6 p.m. to 6 a.m. While its power was not restored until the end of November 2017, the Hospital remained operational by utilizing an emergency generator. (JA256:12-16).

As the Hospital operated under these emergency circumstances, Petitioner sent a letter to the Union via certified mail and hand-delivery in early October advising that it needed to determine whether a majority of the unit employees had accepted its employment offer prior to determining whether to recognize the Union.

3

(JA980-85). On November 6, Rodriguez advised Echevarria that all the employees who worked for San Lucas had accepted the Petitioner's employment offer, and that Petitioner would recognize the Union as the exclusive representative of employees in all units. (JA986-87). Rodriguez also reiterated her request (originally articulated in a September 8 letter to Ana Consuelo Meléndez, Union President) that the Union provide proposals for the units and to include its request for a meeting. Lastly, she replied to the Union's September 13 request for information, attaching a sample of the September 8 offers of employment. (JA988-993).

**B.** **Checks Issued In Appreciation For Working During Hurricane Maria.** On November 22, at Thanksgiving staff luncheons, Rogelio Diaz, the Hospital Administrator, and Rodriguez distributed certificates and $150 checks from Petitioner's corporate parent, MGH, to union, nonunion, and contracted employees who worked overnight on September 19 into the morning of September 20 during Hurricane Maria. (JA994; JA1680-82). Employees at all MGH hospitals in Puerto Rico who had worked overnight also received such payments. (JA1682). The certificates stated "*because you put the life and safety of our patients above all during the emergency caused by Hurricane Maria. Thanks to you our system makes the difference.*" (JA1680-81). The checks issued by MGH did not deduct income tax or social security and the amount of $150.00 per employee was calculated based

4

upon the surplus of the monies that had been identified by MGH to assist employees who had suffered damages or harm during the Hurricane. (JA294:2-20).

On February 12, the Union (surprisingly) advised Petitioner that it had just learned of the Hurricane Maria payments and requested information and the opportunity to discuss. (JA1505). In response, Rodriguez pointed out: (1) the payments were in appreciation for the employees' demonstrated commitment to patients; the Hospital had provided (without objection from the Union) free meals, clothing, blankets, personal items, and water, as well as additional monetary assistance to unit employees who had loss or damage in their homes; and (3) Petitioner had not recognized the collective bargaining agreements between the Union and San Lucas. (JA1525-28,1533-38,1553-54). As for the Union's request for documents concerning the checks, Rodriguez responded that Petitioner would provide work schedules, attendance records, and payroll records, but asked the Union to explain the relevance as to copies of the checks, since Petitioner had already provided records of the payments. (*See* JA736 ¶ 49).

### C.    **Petitioner's Lawful Withdrawal Of Recognition From The Union.**

Effective February 5, 2018, Petitioner withdrew recognition of the Union as the bargaining representative for the Hospital technicians (Unit D) because it had "objective demonstrative evidence that a significant majority" of the unit did not

wish to be represented by the Union.[2] (JA997-98). On February 11, *after the withdrawal of recognition of the technician's unit*, Petitioner granted a salary adjustment to technicians, which had the effect of increasing their hourly rates. (JA1003-04).

On February 14, Petitioner withdrew recognition of the Union as the collective bargaining representative for the clerical workers (Unit E) and returned to the Union's its proposals for the technicians' and clerical workers' units, both of which were provided after Petitioner withdrew recognition from the Union as to Unit D.[3] (JA1506-09).  By separate letter of February 14, Petitioner confirmed receipt of the Union's bargaining proposals as to the medical technologist, LPN, and RN units (Units A, B and C, respectively), and stated: (1) Petitioner would commence its review; (2) Petitioner would submit its counterproposals by the third week of April; and (3) the parties could then begin the bargaining process. (JA1510-11). The Union objected to Petitioner's timetable for negotiations and requested Petitioner to provide available dates as soon as possible, in response to which Petitioner asserted that the

---

[2] Petitioner had received two documents with the signature of 11 of the 17 Unit D employees expressing their wish not to be represented by the Union. (*See* JA1866-69).

[3] Petitioner had received documents with the signature of 31 of the 42 Unit E employees expressing their wish not to be represented by the Union. (*See* JA1893-98).

Union's failure to submit proposals at any time since October was responsible for any delay in negotiations. (JA1519-22).

On February 16, Petitioner withdrew recognition of the Union as the representative of Unit A.[4] (JA1516-17). At the time, the Unit consisted of nine employees. (JA1518). On April 6, Petitioner withdrew recognition of the Union as the representative of RNs (Unit C) and returned the Union's proposal for said unit. (JA1555-56).[5]  On April 18, Petitioner sent the Union its proposal for employees in the LPN unit (Unit B): however, it withdrew its recognition from the Union and its proposal on April 24. (JA1785-1831; JA1557-58).[6] At the time, 16 employees were in Unit B. (JA743 ¶ 84).

**D.** **Petitioner's Lawful Changes To Terms And Conditions Of Employment**.  In the aftermath of Hurricane Maria, responding to a curfew established by the local government, concerns regarding infrastructure and roads, and for the employees' security, and in accordance with its contingency plan, Petitioner assigned RNs in clinical areas to work 12-hour shifts. The schedule

---

[4] Petitioner had received documents with the signatures of all nine Unit A employees expressing their wish not to be represented by the Union. (JA1962-67).

[5] Petitioner had received documents with the signatures of 60 of the 109 Unit C employees expressing their wish not to be represented by the Union. (JA2026-76).

[6] Petitioner had received documents with the signatures of 10 of the 16 Unit B employees expressing their wish not to be represented by the Union. (JA2006-25).

changes caused by this emergency response lasted until on or about October 21, after which the RNs reverted to 8-hour shifts. (JA256:12-16). The Union, however, did not raise any concerns with the mandatory nature of the shift changes until approximately three and one-half months later. (JA1512-13). Petitioner responded that it had told the Union in October the 12-hour shifts could not be granted in a voluntary manner because it prevented preparation of the schedule. (JA1512-13, 1523-24).

On March 7, the Union informed Petitioner that it had learned unit employees would be receiving an orientation about the Menonita Health Plan on March 14, and he requested to meet and bargain. (JA1529-30). Petitioner responded that it had not made changes to the medical insurance benefits provided to employees in the two units the Union still represented (RN and LPN). (JA1531-32). Instead, Petitioner extended the same plan with the same coverage the employees agreed to when they accepted their offers of employment. (*Id.*).[7] Shortly thereafter, Petitioner provided the Union with: (a) a copy of a sheet distributed to employees in the two units summarizing their health insurance benefits; and (b) a copy of the attendance sheet for the March 14 meeting, signed by unit employees. (JA1543-52). On April 1,

---

[7] Rodriguez also mentioned the Union's proposals included a medical plan article, which the parties would discuss, and Petitioner would consider the totality of the Union's proposal but could not consider the health plan in an isolated manner. (JA1531-32, 1543-48).

8

Petitioner reduced the cost of health insurance for the three units (technicians, clerical workers, and medical technologists) for which it had previously withdrawn recognition. (JA742 ¶ 78). Before April 1, employees in those units covered 50 percent of their health care premiums; after April 1, Petitioner absorbed their entire health care premiums. (*Id.*). On May 1 and June 1, Petitioner lowered the cost of health insurance for employees in the RN and LPN units, respectively, by eliminating the 50-percent health insurance premium contribution. (JA743-45 ¶ 85, ¶ 90). Because Petitioner had withdrawn recognition from the Union as to both units, it did not notify or bargain with the Union regarding this change. (*Id.*).

On May 18 (after withdrawal of recognition), Petitioner granted employees in the RN and LPN units a $200 uniform allowance. (JA744 ¶ 86). Toward the beginning of June, the Hospital reexamined the assignment of RNs unit to 12-hour shifts, as opposed to the 8-hour shifts they had been working since at least October 21, 2017. (JA745 ¶ 91). On about June 17, after soliciting input from RNs, Petitioner implemented 12-hour shifts for RNs in several departments. (JA745 ¶¶ 91-92).

In late June or early July 2018, Petitioner distributed and implemented an employee handbook, employee manual, and general rules of conduct, applicable to all employees. (JA745 ¶ 93). Because the Petitioner no longer recognized the Union as the employees' bargaining agent (and because every prior iteration of the relevant

9

CBAs gave Petitioner the right to issue handbooks), it did not notify or bargain with the Union. (JA746 ¶ 100).

## SUMMARY OF ARGUMENT

With respect to the successor doctrine, the Board improperly applied an irrebuttable presumption of union majority status in finding that Petitioner had committed an unfair labor practice by withdrawing recognition of the Union as the representative of the five units at issue, despite Petitioner having received adequate evidence that a majority of employees in each unit no longer wanted to be represented by the ineffectual, unresponsive Union.  The presumption is not entitled to deference given the Board's decades-long vacillation between applying a rebuttable and irrebuttable presumption, and it is contrary to both pronouncements by the U.S. Supreme Court and the purposes of the Act.

Prior to becoming aware of the lack of majority status, Petitioner engaged the Union; however, the record demonstrates that it was the Union that was responsible for any delay in negotiations. Petitioner ceased bargaining with respect to the units only after it became aware of the employees in each respective unit no longer wanting to be represented by the Union. Any alleged unilateral change by Petitioner: (a) occurred after the parties had reached an impasse; (b) were required under law; (c) was in appreciation for employee sacrifice during a hurricane and did not involve a term or condition of employment; or (d) took place after Petitioner's lawful

withdrawal of recognition. Similarly, Petitioner complied with any request for information from the Union until the Union no longer enjoyed majority status.

Finally, the Board's imposition of extraordinary remedies concerning bargaining with the Union are excessive and inappropriate in light of the record, which shows Petitioner properly bargained with the Union until becoming aware that the employees in the various units the Union represented no longer wanted it.

## STANDING

Petitioner has Article III standing because the Decision injures Petitioner by, among other things, requiring it to recognize and bargain with the Union, rescind changes in unit employees' terms and conditions of employment, and post notices. *See Sierra Club v. EPA,* 292 F.3d 895, 900 (D.C. Cir. 2002) (finding little question of standing where party seeks review of agency adjudication).

## STANDARD OF REVIEW

The Court "may set aside a decision of the Board when it departs from established precedent without reasoned justification, or when the Board's factual determinations are not supported by substantial evidence." *King Soopers, Inc. v. N.L.R.B*, 859 F.3d 23, 29–30 (D.C. Cir. 2017). Likewise, the Court may set aside a decision where "'the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case.'" *Wayneview Care Ctr. v. N.L.R.B.*, 664 F.3d 341, 348 (D.C. Cir. 2011).

11

## ARGUMENT

**I.  THE BOARD INAPPROPRIATELY APPLIED THE SUCCESSOR BAR DOCTRINE (STATEMENT OF ISSUES 1-3, 5-8).**

The Board can develop rules concerning national labor policy where a statute is silent or ambiguous "as long as [the rule] is rational and consistent with the Act." *BPH & Co., Inc. v. NLRB*, 333 F.3d 213, 222 (D.C. Cir. 2003) (quoting *NLRB v. Curtis Matheson Scientific, Inc.*, 494 U.S. 775, 787 (1990)). "But such deference is not afforded if the Board's rule is inconsistent with the Act." *Id.* Even a rational Board rule can be judicially enforced only if "supported by substantial evidence on the record." *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 42 (1987).

In this case, the Board applied the "successor bar" doctrine adopted in *UGL-UNICCO*, 357 NLRB 801 (2011), which purported to make what was previously a rebuttable presumption of a union's majority status, irrebuttable.  Relying on its flawed interpretation, the Board concluded the Petitioner unlawfully withdrew recognition from the Union. As discussed below, the Board's interpretation of the successor bar is not entitled to any deference by this Court and is inconsistent with both Supreme Court precedent and the Act.

**A. <u>The Board's Vacillating Application Of The Successor Bar Is Not Entitled to Deference.</u>**

The Board has inconsistently applied the successor bar doctrine, dithering as to whether a union's presumption of majority status is rebuttable. Its interpretation

12

of the doctrine, therefore, is not entitled to deference. *See Bath Marine Draftsmen's Ass'n v. NLRB*, 475 F.3d 14, 25 (1st Cir. 2007) (the "Board is not entitled to the normal deference" when it "has not been consistent in its choice of standard"); *Local 777, Democratic Union Org. Comm. v. NLRB*, 603 F.2d 862, 871-872 (D.C. Cir. 1978) (NLRB's vacillation "vitiates the deference we would otherwise show…").

In *Southern Moldings*, the Board held a successor employer could challenge a union's status as the employees' representative if it had a good faith doubt that the union still had majority support. 219 NLRB 119 (1975). The Board reasoned the successor employer stood in the predecessor's shoes, and a union is not entitled to any greater rights or protections than it would have had with the former employer. *Id.* In *Landmark Int'l Trucks*, however, the Board held that once a successor employer recognizes a union, the successor must afford the union a "reasonable time" for bargaining prior to withdrawal of recognition, creating an irrebuttable presumption of majority status. 257 NLRB 1375 (1981). Reviewing the *Landmark* decision, the Sixth Circuit found "no basis for such a holding" and rejected the Board-created irrebuttable presumption. *Landmark Int'l Trucks, Inc. v. NLRB*, 699 F.2d 815,818 (6th Cir. 1983). The court reasoned that a change in ownership "does not disturb the relationship between employees and the union," and when "a successor forms a reasonable, good faith doubt as to the union's continuing majority status it is no longer bound to continue recognition and bargaining." *Id.* at 818-19.

13

Under this standard, an employer's presentation of evidence supporting reasonable doubt as to a union's majority status shifts the burden to the Board's General Counsel to prove the union had majority support on the date in question. *Id.* at 819.

Two years later the Board adopted the Sixth Circuit's reasoning in *Landmark*, reaffirming the premise that an established union enjoys only a rebuttable presumption of majority status, and that a successor may withdraw recognition from the union based on lack of employee support. *Harley-Davidson Transportation Co.*, 273 NLRB 1531 (1985). Over the next two decades, however, the Board continued to gravitate between rebuttable and irrebuttable presumptions. *St. Elizabeth Manor, Inc.*,329 NLRB 341, 343 (1999) (applying an irrebuttable presumption); *MV Transportation*, 337 NLRB 770, 772 (2002) (rebuttable presumption); *UGL-UNICCO*, 357 NLRB at 805 (irrebuttable presumption).[8]

In *UGL-UNICCO* (which the Board relied upon here), the Board's only argument for the decision to return to an irrebuttable presumption was that the "number and scale of corporate mergers and acquisitions has increased dramatically over the last 35 years," that such transactions had a destabilizing effect on collective bargaining relationships, and that the Board must adjust its doctrines accordingly. *UGL-UNICCO*, 357 NLRB at 805. The Board offered absolutely no evidence, let

---

[8] The Board notably recognized that its jurisprudence was "contradictory," *UGL-UNICCO*, 357 NLRB at 802, and that its caselaw, even at the time of the *St. Elizabeth* decision, had "wandered back-and-forth," *id.* at 805.

alone substantial evidence, to support its conclusion that a rebuttable presumption is more "destabilizing" than requiring recognition and bargaining with a union unsupported by a majority of the employees. *See id.* at 807. Similarly, the Board offered no evidence to support its conclusion that the "stability" provided by the irrebuttable presumption does not "unduly burden" employee free choice. *See id.* at 808. It focused instead on superficial speculation about how employers, unions, and employees are likely to act under certain circumstances. This kind of conclusory analysis in the face of decades of contradictory findings does not deserve judicial deference by this Court as it is neither rational nor based on the required "substantial evidence." *See S&F Market Street Healthcare LLC v. NLRB*, 570 F.3d 354 (D.C. Cir. 2009) (granting petition to review and denying enforcement where Board's finding unsupported by "substantial evidence").

The Board's endless vacillation over the last several decades regarding the rebuttability of a union's presumed majority status reflects a lack of reasoned and rational justification for forcing an irrebuttable presumption on successor employers. An irrebuttable presumption under the successor bar is not entitled to any deference by this Court and should be rejected.

### B. <u>The Board's Application Of The Successor Bar Is Contrary to Supreme Court Precedent And The Goals Of The Act</u>.

Aside from being irrational, an irrebuttable successor bar runs afoul of Supreme Court precedent and the Act. It must, therefore, be rejected. The Board's

15

reasoning is predicated, not on *employee* preference, but rather on the notion that the *status quo* (*i.e.,* representation resulting in no new collective bargaining agreements for four years preceding Petitioner's acquisition of San Lucas, lower wages, higher health insurance costs, and resistance to the Hospital's unexpected gift to employees) outweighed the employees' right to choose how and by whom they are represented. No provision of the NLRA, however, requires employees to shackle themselves to a union by which they no longer wish to be represented. Any interpretation of the NLRA providing otherwise contravenes not only the employees' rights to refrain from or choose representation, but the purpose of the Act itself (*i.e.*, to advance the welfare of workers).  The Board's decision therefore cannot be enforced.

In *NLRB v. Burns International Security Services, Inc.*, the Supreme Court, while affirming the rule that a successor hiring a majority of its predecessor's employees must recognize the choice made by those employees regarding union representation, held that a presumption of majority status can be rebuttable. 406 U.S. 272, 278-81 (1972).  Similarly, in *Fall River*, the Court held: "Where…the union has a **rebuttable** presumption of majority status, this status continues **despite the change in employers**." 482 U.S. 27, 41 (1987) (footnote omitted; emphasis added).

*UGL-UNICCO* is contrary to the Supreme Court's language in *Burns* and *Fall River* and ignores the words of Justice White in *Burns* that the "[r]esolution [of the case] tums to a great extent on the precise facts involved…." *Burns*, 406 U.S. at 274.

16

To comport with the Supreme Court's holdings in *Burns* and *Fall River*, the Board's ruling must be vacated, and the presumption of majority status must be rebuttable.

In addition to flouting Supreme Court precedent, establishing an irrebuttable presumption is wholly inconsistent with Section 7 of the Act, which states: "Employees shall have the right … to bargain collectively through representatives of their own choosing, … and shall also have the right to refrain from any or all such [collective] activities...." 29 U.S.C. § 157. Although the Board acknowledged in *UGL-UNICCO* the strongest argument against a 'successor bar' is the burden the bar places on employees' Section 7 rights—the bedrock principle of the Act—it nevertheless declared, without evidence or support, that an irrebuttable presumption "does not unduly burden employee free choice, because it extends ... only for a reasonable period of bargaining, ... 'not in perpetuity.'" *UGL-UNICCO*, 357 NLRB at 808 (citing *St. Elizabeth Manor*, 329 NLRB at 346). That argument is spurious.

Under the doctrine contained in *UGL-UNICCO*, and the Board's decision here, Petitioner's registered nurses, practical nurses, medical technologists, technicians, and clerical workers would be forced to accept the Union's representation for at least six months, despite no longer wanting it. This decision, which applies an irrebuttable presumption of majority status and requires an employer to ignore the employees' preference for up to one year, makes the Congressionally mandated Section 7 rights to "bargain collectively through

17

representatives of their own choosing" and "refrain from any or all such activities" illusory. *See* 29 U.S.C. § 157. By equating "labor stability" and employee rights, the Board has given more weight to unions' interests than to those of employees.

Because employee choice is at the NLRA's core, labor stability can be compatible with the Act only when it reinforces employee rights.  The interpretation of the successor bar applied in this case does ignores employee rights.  As the Supreme Court has made clear, the Act protects employees, not unions or employers. *See Lechmere, Inc. v. NLRB*, 502 US 527, 531-32 (1992).  Consequently, the decision directly contradicts the purpose of the Act and results in an unwanted union continuing its "representation," despite the employees' wishes.  Requiring unwanted representation is a denial of the rights protected by *Burns*, *Fall River*, and the Act. The Board's decision cannot be enforced.

## II.    PETITIONER DID NOT VIOLATE SECTIONS 8(A)(1), 8(A)(5), OR 8(D) OF THE ACT (STATEMENT OF ISSUES NO. 4, 9, 10).[9]

The Board's finding that Petitioner failed to meet and bargain in good faith hinged on the incorrect assumption that the Union still represented the collective bargaining units. Rather, the Board (and the ALJ) found an irrebuttable presumption that the Union remained the representative for all five bargaining units at the

---

[9] The Board correctly found that the temporary shift change for RNs during the aftermath of Hurricane Maria was not raised by the Union within the statute of limitations and, therefore, was untimely.

18

Hospital. The Board's flawed conclusion rests solely on its waffling interpretation of the successor bar doctrine.[10] As addressed above, the successor bar doctrine was incorrectly interpreted and applied in this matter. Petitioner lawfully withdrew recognition from the Union and therefore had no obligation to bargain over terms and conditions of employment. (*See* Section I, *supra*).

### A.    Petitioner Did Not Refuse to Bargain With The Union.

Apart from the successorship issue, the Board's finding that Petitioner violated the Act by failing to bargain is baseless. The Board confusingly concluded that Petitioner "condition[ed] an in-person meeting upon the submission of written proposals and then further delay[ed] bargaining…," claiming the Union "had been asking to bargain since mid-October 2017 and was not required to repeat its request." (JA613). In making its finding, however, the Board selectively (and tellingly) recognized the Union's purported efforts to bargain, while ignoring Petitioner's. Specifically, the Board failed to acknowledge that Petitioner met in-person with the Union on October 20, 2017, and on October 27, 2017, (JA734 ¶ 43, JA735 ¶ 46), that the Union took nearly four months after the initial request to provide written proposals to Petitioner despite several requests to provide them (JA735 ¶¶ 47-48, JA737 ¶ 57, JA738 ¶ 59), and that these proposals were not submitted to Petitioner

---

[10] The ALJ precluded Petitioner from presenting evidence regarding the Union's loss of majority status. (JA632).

until *after* Petitioner notified the Union it was withdrawing recognition of the Union as the bargaining agent for the Technicians Unit on February 5, 2018, (JA736 ¶ 52). In other words, the Union, spurred by its fear that it was losing its grasp on Petitioner's employees, finally decided to provide its bargaining proposals to Petitioner. Such *post hoc* attempts to seek bargaining do not serve as a proper predicate for a failure-to-bargain finding.

**B. <u>Petitioner Did Not Unlawfully Change Terms And Conditions Of Employment.</u>[11]**

Even if the Board's current (but by no means static) interpretation of the successor bar doctrine is correct, the Union no longer enjoyed an irrebuttable presumption of majority status by March 14, 2018.[12] Petitioner purchased the assets and assumed operations of San Lucas by September 13, 2017. (JA733 ¶ 36). By March 14, 2018, six months and one day had passed since Petitioner's assumption of San Lucas. Despite this, the Board did not consider whether the Union was still

---

[11] The Board correctly found that the Union did not timely allege an unfair labor practice with respect to the change in the RNs' shifts from 8 to 12 hours for approximately one month in the aftermath of Hurricane Maria. Even if it had considered the shift change, the temporary change conformed with Petitioner's established contingency plan (and the local government's curfew).

[12] The Board will undoubtedly argue the clock does not begin until the first negotiation. But that argument is incongruous with the position that the Union possesses an *irrebuttable* presumption that it remains the exclusive bargaining agent for the units. If the Union truly retains its status as bargaining agent, there is no need for the Hospital to recognize the status with which the Union is automatically and irrefutably endowed and, therefore, no need to wait for the Hospital's recognition.

the bargaining agent for the applicable unit(s) as of the dates (all but one occurring more than six months after the acquisition of San Lucas) Petitioner is alleged to have: (1) instituted or reinstituted 12-hour shifts for RNs on or about June 17, 2018; (2) eliminated unit employees' portion of their health insurance premiums on dates from April 1, 2018, to June 1, 2018; (3) provided a $200 uniform allowance for RNs and LPNs on May 18, 2018; (4) distributed and implemented an employee handbook in June or early July; and (5) increased technicians' wages. Even under the Board's interpretation of the successor bar doctrine, there is no evidence the Union still had majority support when the above actions were taken. Without determining whether the Union was still the exclusive bargaining agent for the respective units—a determination that should have occurred even under the Board's interpretation of the successor bar—the Board committed error in finding Petitioner unilaterally changed the terms and conditions of employment. Regardless, the Board's findings that Petitioner failed to bargain specific issues in violation of Sections 8(a)(1) and 8(a)(5) of the NLRA were incorrect for the reasons stated below.

1.     ***The Parties Reached Impasse Regarding Implementation Of A 12-Hour Shift For The RN Unit.***

A "bargaining impasse—which justifies an employer's unilateral implementation of new terms and conditions of employment—occurs when good faith negotiations have exhausted the prospects of concluding an agreement, … leading both parties to believe that they are at the end of their rope." *TruServ Corp.*

21

*v. N.L.R.B.*, 254 F.3d 1105, 1114 (D.C. Cir. 2001), *as amended* (Aug. 17, 2001) (internal alterations and quotations omitted).  The duty to bargain is satisfied if "the party declaring an impasse does so in good faith and its conclusion is justified by objectively established facts." *AMF Bowling Co. v. N.L.R.B.*, 63 F.3d 1293, 1299 (4th Cir. 1995). "[A]fter good-faith negotiations have exhausted the prospects of concluding an agreement, an employer does not violate the Act by making unilateral changes that are reasonably comprehended within [its] pre-impasse proposals." *Taft Broad. Co., Wdaf Am-Fm TV*, 163 NLRB 475, 478 (1967).  Petitioner met with the Union at least two separate times, on October 20 and October 27, 2017, to discuss implementing a 12-hour shift for the RN Unit. (JA734 ¶ 43, JA735 ¶ 46).  In both meetings, the Union took the position that it would agree to the change only if each affected employee could choose to work 8- or 12-hour shifts.  (JA734 ¶ 43, JA1512-13).  The Union's request was untenable; it would require Petitioner to accommodate different shifts during the same timeframe, preventing preparation of the work schedule in a place where stability is the goal.  The Union reiterated its position in a letter to Petitioner on February 14, 2018 — nearly four months later. (JA1512-13). On March 6, Petitioner reasserted its position regarding the implementation of 12-hour work shifts. (JA1523-24).  For over four months, therefore, the Parties' respective positions regarding the schedules remained unchanged. Undoubtedly, Petitioner and the Union had reached an impasse.  The Board pointed to no evidence

contradicting this position. Because the Parties reached impasse, Petitioner had the right to implement its last offer (the 12-hour shift).  It did so on or about June 17, 2018. The Board's Decision, which ignored the stalemate reached by the Parties after multiple months of bargaining, therefore, was arbitrary and capricious.

### 2.     *Petitioner Did Not Violate The Act By Eliminating The Employees' Portion Of Their Health Insurance Premium.*

From September 8 through 12, 2017 (before assuming operations at San Lucas), Petitioner sent letters to San Lucas' employees outlining terms and conditions of employment and giving until September 12 to accept or reject the offer. (JA970-75).  The terms and conditions provided included different medical plan coverage. (*Id.*).  Specifically, the letter stated the coverage would change from Triple S to the Menonita Health Plan effective October 1, 2017, and that employee contribution would be similar or less than contributions made under the San Lucas medical plan. (*Id.*).  Every employee hired from San Lucas accepted these terms. Despite this, the Union emailed Petitioner on March 7, 2018, claiming Petitioner had not notified or bargained with the Union regarding the medical plan.  (JA1529-30). Petitioner responded the same day, pointing out that it did not make any changes with respect to Units B or C, the only two units for which Petitioner still recognized the Union as bargaining agent, and indicating it would bargain with the Union over health plans as to those units. (JA1531-32).  Even if the Union still represented all units, Petitioner maintained the same provider indicated in the September 2017 letter

23

and, consistent with the letter, provided a health plan with an employee contribution similar or less than that offered by San Lucas. It therefore did not materially alter any terms or conditions of employment.

### 3. *Petitioner Did Not Violate The Act By Providing A Statutorily Mandated Uniform Allowance.*

The Board erroneously found that Petitioner failed to bargain over a statutorily mandated uniform allowance. Under the Puerto Rico Minimum Wage, Vacation and Sick Leave Act, every health services employer is required to furnish or pay for its employees' uniforms. L.P.R.A § 250e. The Board's finding, therefore, that Petitioner committed a ULP by following the law, seemingly requires Petitioner to break the law. Such a finding is contrary to the Act.

### 4. *Petitioner's Implementation of the Employee Handbook was within the Hospital's Statutory and Contractual Rights.*

The implementation of the Employee Handbook was a right of the Hospital recognized by the Union in prior collective bargaining agreements, (JA822; JA911; JA962), as well as in proposals provided to the Hospital by the Union, (JA1086; JA1207-08; JA1291-92; JA1391; JA1493). Petitioner, therefore, acted in accordance with the rights the Union always acknowledged as belonging to Petitioner. Petitioner, therefore, did not act in a manner contrary to the NLRA.

### 5. *Petitioner's Decision To Raise The Wages For Technicians Did Not Violate The Act.*

On or about February 11, 2018, Petitioner increased wages for the medical technicians. (JA737-38 ¶ 58). This increase came after Petitioner withdrew recognition from the Union. (JA736 ¶ 52; JA997-98). Notably, the increase was provided *before* the Union provided any proposal regarding wages, (*see* JA738 ¶ 59; JA1005-06), and over three months *after* Petitioner asked for the Union's proposals regarding topics subject to collective bargaining, (*see* JA735 ¶¶ 46-47). The Union, therefore, either: (a) was no longer the bargaining representative, or (b) failed to engage in bargaining. The Petitioner's conduct, therefore, cannot be said to have been violative of the Act.

### C. Petitioner Complied With Whatever Requirement It May Have Had To Respond To The Union's Request For Information.

With respect to the two units for which Petitioner still recognized the Union as exclusive bargaining agent (Units B and C), the Union alleges that on March 14, 2018, it requested: (1) copies of all documents signed by the employees during that day's meeting, and (2) copies of the attendance sheet for the meeting. (JA1539-42). Petitioner responded to the request on March 19, 2018, providing: (1) a copy of the sheet distributed to unit employees summarizing the plan's benefits, and (2) a copy of the attendance sheet with the unit employees' signatures. (JA741 ¶ 76; JA1543-1552). It remains unclear what further information the Union was requesting. The

Board adopted the ALJ's confusing conclusion that Petitioner violated Sections 8(a)(1) and (5) by not providing copies of documents signed by employees during the meeting. But Petitioner did provide copies of documents signed by employees, namely, the attendance sheet. Regardless, there is simply no indication that the documents allegedly not provided, if they even exist, were "needed" by the Union to perform its duties, which is what the Petitioner was required to provide. *N. L. R. B. v. Acme Indus. Co.*, 385 U.S. 432, 435–36 (1967). Indeed, Petitioner provided a copy of the document given to the unit employees, which contained a summary of the plan, as well as a list of all the unit employees who attended the meeting, with their signatures – which is what the Union reasonably would need to assess issues related to the health plan. (*See* JA1543-1552). Petitioner, therefore, complied with its obligations, regardless of whether it provided each and every document requested.

### D.    The NLRB Erred In Finding Appreciation Payments To Employees That Worked Overnight During Hurricane Maria Violated Section 8(A)(1) And (5) Of The Act.

The $150 payment to employees who worked during Hurricane Maria was unrelated to seniority, hours worked, or any performance metric. It was simply a gift provided to employees who stayed overnight at the Hospital during a catastrophic event. There is no violation of the NLRA for such payments.

26

A ULP occurs when an employer "unilaterally alters 'wages, hours, and other terms and conditions of employment' without first notifying and bargaining with the union." *Phelps Dodge Min. Co., Tyrone Branch v. N.L.R.B.*, 22 F.3d 1493, 1496 (10th Cir. 1994) (citation omitted). When "determining whether a particular practice should be characterized as a term or condition of employment, the Board has examined the regularity of the practice and the way in which the employer has treated it." *Id.* (internal quotations and citation omitted). A one-time gift, particularly given as the result of attendance during a natural disaster — which, by its nature, is unpredictable — cannot be said to create a *status quo*. *See Phelps*, 22 F.3d at 1496-97 (finding insufficient evidence to show eight payments over four years was "of such a fixed nature to rise to the level of an established 'term and condition' of employment"); *see also S. Maryland Hosp. Ctr. v. N.L.R.B., 801 F.2d 666, 669 (4th Cir. 1986)* (refusing, where union claimed entitlement to bonus, "to give any credence to the proposition that a one-time gift such as that given …, standing alone, could in any way establish a policy or practice of yearly bonuses. Christmas bonuses are generally discretionary in nature and must be given over a significant period of time before they can be considered part of the *status quo*.").

The Board's determination that the Hospital violated the NLRA by giving a one-time gift to its employees in appreciation for staying at the hospital overnight during a hurricane is contrary to established precedent and unsupported by

27

substantial evidence.  The Board's Decision should be overturned as to this issue.

    **E.**    **The Board Erred In Finding Petitioner Did Not Discharge Its Duty To Bargain.**

While the Union now claims it wanted to negotiate terms and conditions of employment with Petitioner, it delayed providing the terms in writing.  As explained in Section II(A)(1) above, Petitioner met with the Union on October 20 and October 27, 2017, and asked the Union multiple times to provide proposals so it could evaluate the requests and respond accordingly.  The Union did not do so for nearly four months.  By the time the Union provided proposals to the Hospital, the Hospital had already set budget meetings in April. Accordingly, the Hospital sought six weeks (as compared to the four months the Union took) so it could evaluate the proposals within the context of the budget meetings.  In essence, the Board's finding permits a union to delay while mandating an employer rush to respond to the union's demands.  The Act does not contemplate such a one-sided analysis of the bargaining relationship, and the Union's failure to properly engage in negotiations effectively waives any claim that Petitioner failed to properly bargain.

**III.**  **THE NLRB ERRED BY IMPOSING EXTRAORDINARY REMEDIES (STATEMENT OF ISSUES NUMBER 11, 12 & 13).**

The Board affirmed the ALJ's decision mandating a special and extraordinary remedy, which instructed Petitioner: (a) to bargain for 15 hours per week until an agreement or lawful impasse is reached or until the parties agree to a respite in

28

bargaining, and (b) to prepare written bargaining process reports every 15 days for submission to the Regional Director and service upon the Union with an opportunity for the Union to reply. The Board has previously determined that such an extraordinary remedy can only be ordered if the employer's conduct was egregious or its defenses so frivolous as to merit it. *Crystal Springs Shirt Corp, 229 NLRB No. 10, 95 LLRM 20 1038 (1977)*. Such circumstances are not present here since, as previously stated (in Section II), Petitioner made changes in certain employee benefits only after it withdrew recognition from specific bargaining units after receiving written evidence of lack of majority status. The Board agreed with the ALJ's inclusion of these special remedies on three bases: (1) the unlawful withdrawal of recognition from all five units; (2) an alleged pattern of conduct that showed no serious interest in engaging in collective bargaining and (3) its imposition of unilateral changes when it still recognized the Union. (JA371: 31-36). The first and third bases utilized by the ALJ are addressed in Section II, *supra*. Concerning the second basis, the ALJ could only rely upon conduct occurring after the withdrawal of the recognition of the Union for the different units since, as set forth below, no unfair labor practices occurred prior to the withdrawal of recognition. The ALJ's conclusion that Petitioner's conduct "*... give[s] rise to a strong suspicion that the Petitioner had no intention of engaging in meaningful bargaining...,*" (JA367:24-38), is therefore flawed.

29

Contrary to the ALJ's (and the Board's) analysis, the evidence clearly established that Petitioner and the Union met on various occasions and had been communicating by text and letter during the months of October and November 2017. During that time, they did meet and bargain over the 12-hour shift.  Such conduct (as reaffirmed by Petitioner's November 6, 2017 letter), demonstrates that Petitioner intended to recognize the Union. Afterwards, Petitioner repeatedly requested that the Union submit its bargaining proposals to commence the bargaining process.  The Union, however, delayed bargaining simply because it wished to see how Charge 12-CA-210321–which the Region ultimately dismissed–would resolve.[13] *Moreover,* the ALJ ignored that the Union sent its bargaining proposals regarding the technicians' unit *after* it received notification of Petitioner's withdrawal of recognition. Given the Union's delay in submitting its bargaining proposal for three months and two weeks, it is improper to conclude that Petitioner had no intention of engaging in meaningful bargaining because it requested six weeks so it could revise and analyze the proposals as to three separate units and provide counterproposals. Indeed, Petitioner complied and submitted its LPN counterproposal (the only unit still represented by that time) on April 18, 2018.  *Finally,* as discussed in Sections I and II, above, there is no allegation in the Complaint, nor did the Board find, that the

---

[13] The Board's Decision erroneously claims the Union requested bargaining by text as early as October 12, 2017. (*See* JA613 at n.8). The October 12 text only requests that Ms. Rodriguez provide dates in which to talk, which she did. (JA1746).

withdrawal of recognition of each unit was made prior to the Petitioner having objective demonstrative evidence that the employees no longer wished to be represented by the Union.  Neither the ALJ nor the Board address this issue, not because the record showed Union support – which is contrary to the undisputed (albeit rejected) evidence - but because it merely and automatically applied a flawed version of the successor bar doctrine.  The special remedies established in the Board's Decision should not be enforced.

## CONCLUSION

Based on the foregoing facts, arguments, and authorities, Petitioner respectfully requests this Honorable Court to deny enforcement and set aside the Board's Decision.

Dated April 21, 2023.

Respectfully submitted,

*s/ Patrick M. Muldowney*
Patrick M. Muldowney, Esq.
pmuldowney@bakerlaw.com
**BAKER & HOSTETLER LLP**
200 South Orange Avenue, Ste. 2300
Orlando, FL 32802-0112
Telephone: (407) 649-4000
Facsimile: (407) 841-0168

USCA Case #22-1163    Document #1995949    Filed: 04/21/2023    Page 42 of 61

Ángel Muñoz Noya, Esq.
Bar No. 46830
amunoz@sbsmnlaw.com
**SÁNCHEZ-BETANCES, SIFRE
& MUÑOZ-NOYA**
33 Calle Bolivia, Suite 500
San Juan, Puerto Rico 00917
Tel.: 787-756-7880
Fax: 787-753-6580

*Attorneys for Petitioner/Cross-Respondent*

32

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure and Circuit Rules 32(a)(7), I hereby certify that the foregoing Petitioner's Opening Brief contains 8,895 words, as counted by a word processing system that includes headings, footnotes, quotations and citations in the count, and therefore is within the word limit set by the Court. I further certify that this brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*s/Patrick M. Muldowney*
Counsel to Petitioner

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Petitioner's Opening Brief and Addendum was filed electronically with the Court by using the CM/ECF system on April 21, 2023.  I further certify that the foregoing document was served on all those parties or their counsel of record through the CM/ECF system.

*s/Patrick M. Muldowney*
Counsel for Petitioner

4882-2819-3631.1

**ADDENDUM**

**TABLE OF CONTENTS**

**PAGE**

29 U.S.C. § 151……………………………………………………..... Add. 1

29 U.S.C. § 157…………………………………………………… Add. 3

29 U.S.C. § 158……………………………………………………. Add. 4

29 U.S.C. § 160…………………………………………………. Add. 10

29 L.P.R.A. § 250e………………………………………………… Add. 15

United States Code Annotated
  Title 29. Labor
    Chapter 7. Labor-Management Relations (Refs & Annos)
      Subchapter II. National Labor Relations (Refs & Annos)

29 U.S.C.A. § 151

§ 151. Findings and declaration of policy

Currentness

The denial by some employers of the right of employees to organize and the refusal by some employers to accept the procedure of collective bargaining lead to strikes and other forms of industrial strife or unrest, which have the intent or the necessary effect of burdening or obstructing commerce by (a) impairing the efficiency, safety, or operation of the instrumentalities of commerce; (b) occurring in the current of commerce; (c) materially affecting, restraining, or controlling the flow of raw materials or manufactured or processed goods from or into the channels of commerce, or the prices of such materials or goods in commerce; or (d) causing diminution of employment and wages in such volume as substantially to impair or disrupt the market for goods flowing from or into the channels of commerce.

The inequality of bargaining power between employees who do not possess full freedom of association or actual liberty of contract, and employers who are organized in the corporate or other forms of ownership association substantially burdens and affects the flow of commerce, and tends to aggravate recurrent business depressions, by depressing wage rates and the purchasing power of wage earners in industry and by preventing the stabilization of competitive wage rates and working conditions within and between industries.

Experience has proved that protection by law of the right of employees to organize and bargain collectively safeguards commerce from injury, impairment, or interruption, and promotes the flow of commerce by removing certain recognized sources of industrial strife and unrest, by encouraging practices fundamental to the friendly adjustment of industrial disputes arising out of differences as to wages, hours, or other working conditions, and by restoring equality of bargaining power between employers and employees.

Experience has further demonstrated that certain practices by some labor organizations, their officers, and members have the intent or the necessary effect of burdening or obstructing commerce by preventing the free flow of goods in such commerce through strikes and other forms of industrial unrest or through concerted activities which impair the interest of the public in the free flow of such commerce. The elimination of such practices is a necessary condition to the assurance of the rights herein guaranteed.

It is hereby declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection.

**CREDIT(S)**

(July 5, 1935, c. 372, § 1, 49 Stat. 449; June 23, 1947, c. 120, Title I, § 101, 61 Stat. 136.)

Add. 1

Notes of Decisions (547)

29 U.S.C.A. § 151, 29 USCA § 151
Current through P.L. 117-327. Some statute sections may be more current, see credits for details.

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 29. Labor
    Chapter 7. Labor-Management Relations (Refs & Annos)
      Subchapter II. National Labor Relations (Refs & Annos)

29 U.S.C.A. § 157

§ 157. Right of employees as to organization, collective bargaining, etc.

Currentness

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

**CREDIT(S)**

(July 5, 1935, c. 372, § 7, 49 Stat. 452; June 23, 1947, c. 120, Title I, § 101, 61 Stat. 140.)

Notes of Decisions (1306)

29 U.S.C.A. § 157, 29 USCA § 157
Current through P.L. 117-327. Some statute sections may be more current, see credits for details.

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

United States Code Annotated
  Title 29. Labor
    Chapter 7. Labor-Management Relations (Refs & Annos)
      Subchapter II. National Labor Relations (Refs & Annos)

29 U.S.C.A. § 158

§ 158. Unfair labor practices [Statutory Text & Notes of Decisions subdivisions I to VI]

Currentness

<Notes of Decisions for 29 USCA § 158 are displayed in multiple documents.>

**(a) Unfair labor practices by employer**

It shall be an unfair labor practice for an employer--

**(1)** to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

**(2)** to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: *Provided*, That subject to rules and regulations made and published by the Board pursuant to section 156 of this title, an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay;

**(3)** by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided*, That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 159(a) of this title, in the appropriate collective-bargaining unit covered by such agreement when made, and (ii) unless following an election held as provided in section 159(e) of this title within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: *Provided further*, That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;

**(4)** to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter;

---

Add. 4

**(5)** to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

**(b) Unfair labor practices by labor organization**

It shall be an unfair labor practice for a labor organization or its agents--

**(1)** to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: *Provided*, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein; or (B) an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances;

**(2)** to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;

**(3)** to refuse to bargain collectively with an employer, provided it is the representative of his employees subject to the provisions of section 159(a) of this title;

**(4)(i)** to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is--

**(A)** forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by subsection (e);

**(B)** forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

**(C)** forcing or requiring any employer to recognize or bargain with a particular labor organization as the representative of his employees if another labor organization has been certified as the representative of such employees under the provisions of section 159 of this title;

**(D)** forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or

Add. 5

class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work:

*Provided*, That nothing contained in this subsection shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under this subchapter: *Provided further*, That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution;

**(5)** to require of employees covered by an agreement authorized under subsection (a)(3) the payment, as a condition precedent to becoming a member of such organization, of a fee in an amount which the Board finds excessive or discriminatory under all the circumstances. In making such a finding, the Board shall consider, among other relevant factors, the practices and customs of labor organizations in the particular industry, and the wages currently paid to the employees affected;

**(6)** to cause or attempt to cause an employer to pay or deliver or agree to pay or deliver any money or other thing of value, in the nature of an exaction, for services which are not performed or not to be performed; and

**(7)** to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees:

**(A)** where the employer has lawfully recognized in accordance with this subchapter any other labor organization and a question concerning representation may not appropriately be raised under section 159(c) of this title,

**(B)** where within the preceding twelve months a valid election under section 159(c) of this title has been conducted, or

**(C)** where such picketing has been conducted without a petition under section 159(c) of this title being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing: *Provided*, That when such a petition has been filed the Board shall forthwith, without regard to the provisions of section 159(c)(1) of this title or the absence of a showing of a substantial interest on the part of the labor organization, direct an election in such unit as the Board finds to be appropriate and shall certify the results thereof: *Provided further*, That nothing in this subparagraph (C) shall be construed to prohibit any picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services.

Nothing in this paragraph (7) shall be construed to permit any act which would otherwise be an unfair labor practice under this subsection.

**(c) Expression of views without threat of reprisal or force or promise of benefit**

The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.

**(d) Obligation to bargain collectively**

For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession: *Provided*, That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification--

**(1)** serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;

**(2)** offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;

**(3)** notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute, and simultaneously therewith notifies any State or Territorial agency established to mediate and conciliate disputes within the State or Territory where the dispute occurred, provided no agreement has been reached by that time; and

**(4)** continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later:

The duties imposed upon employers, employees, and labor organizations by paragraphs (2) to (4) of this subsection shall become inapplicable upon an intervening certification of the Board, under which the labor organization or individual, which is a party to the contract, has been superseded as or ceased to be the representative of the employees subject to the provisions of section 159(a) of this title, and the duties so imposed shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract. Any employee who engages in a strike within any notice period specified in this subsection, or who engages in any strike within the appropriate period specified in subsection (g) of this section, shall lose his status as an employee of the employer engaged in the particular labor dispute, for the purposes of sections 158, 159, and 160 of this title, but such loss of status for such employee shall terminate if and when he is reemployed by such employer. Whenever the collective bargaining involves employees of a health care institution, the provisions of this subsection shall be modified as follows:

**(A)** The notice of paragraph (1) of this subsection shall be ninety days; the notice of paragraph (3) of this subsection shall be sixty days; and the contract period of paragraph (4) of this subsection shall be ninety days.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Add. 7

**(B)** Where the bargaining is for an initial agreement following certification or recognition, at least thirty days' notice of the existence of a dispute shall be given by the labor organization to the agencies set forth in paragraph (3) of this subsection.

**(C)** After notice is given to the Federal Mediation and Conciliation Service under either clause (A) or (B) of this sentence, the Service shall promptly communicate with the parties and use its best efforts, by mediation and conciliation, to bring them to agreement. The parties shall participate fully and promptly in such meetings as may be undertaken by the Service for the purpose of aiding in a settlement of the dispute.

**(e) Enforceability of contract or agreement to boycott any other employer; exception**

It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible [1] and void: *Provided*, That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work: *Provided further*, That for the purposes of this subsection and subsection (b)(4)(B) the terms "any employer", "any person engaged in commerce or an industry affecting commerce", and "any person" when used in relation to the terms "any other producer, processor, or manufacturer", "any other employer", or "any other person" shall not include persons in the relation of a jobber, manufacturer, contractor, or subcontractor working on the goods or premises of the jobber or manufacturer or performing parts of an integrated process of production in the apparel and clothing industry: *Provided further*, That nothing in this subchapter shall prohibit the enforcement of any agreement which is within the foregoing exception.

**(f) Agreement covering employees in the building and construction industry**

It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members (not established, maintained, or assisted by any action defined in subsection (a) as an unfair labor practice) because (1) the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such agreement, or (2) such agreement requires as a condition of employment, membership in such labor organization after the seventh day following the beginning of such employment or the effective date of the agreement, whichever is later, or (3) such agreement requires the employer to notify such labor organization of opportunities for employment with such employer, or gives such labor organization an opportunity to refer qualified applicants for such employment, or (4) such agreement specifies minimum training or experience qualifications for employment or provides for priority in opportunities for employment based upon length of service with such employer, in the industry or in the particular geographical area: *Provided*, That nothing in this subsection shall set aside the final proviso to subsection (a)(3): *Provided further*, That any agreement which would be invalid, but for clause (1) of this subsection, shall not be a bar to a petition filed pursuant to section 159(c) or 159(e) of this title.

**(g) Notification of intention to strike or picket at any health care institution**

A labor organization before engaging in any strike, picketing, or other concerted refusal to work at any health care institution shall, not less than ten days prior to such action, notify the institution in writing and the Federal Mediation and Conciliation

Add. 8

Service of that intention, except that in the case of bargaining for an initial agreement following certification or recognition the notice required by this subsection shall not be given until the expiration of the period specified in clause (B) of the last sentence of subsection (d). The notice shall state the date and time that such action will commence. The notice, once given, may be extended by the written agreement of both parties.

## CREDIT(S)

(July 5, 1935, c. 372, § 8, 49 Stat. 452; June 23, 1947, c. 120, Title I, § 101, 61 Stat. 140; Oct. 22, 1951, c. 534, § 1(b), 65 Stat. 601; Pub.L. 86-257, Title II, § 201(e), Title VII, §§ 704(a) to (c), 705(a), Sept. 14, 1959, 73 Stat. 525, 542 to 545; Pub.L. 93-360, § 1(c) to (e), July 26, 1974, 88 Stat. 395, 396.)

Notes of Decisions (5918)

## Footnotes

1       So in original. Probably should be "unenforceable".

29 U.S.C.A. § 158, 29 USCA § 158
Current through P.L. 117-327. Some statute sections may be more current, see credits for details.

**End of Document**                                                © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

United States Code Annotated
    Title 29. Labor
        Chapter 7. Labor-Management Relations (Refs & Annos)
            Subchapter II. National Labor Relations (Refs & Annos)

29 U.S.C.A. § 160

§ 160. Prevention of unfair labor practices [Statutory Text & Notes of Decisions subdivisions I to X]

Currentness

<Notes of Decisions for 29 USCA § 160 are displayed in multiple documents.>

**(a) Powers of Board generally**

The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 158 of this title) affecting commerce. This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise: *Provided*, That the Board is empowered by agreement with any agency of any State or Territory to cede to such agency jurisdiction over any cases in any industry (other than mining, manufacturing, communications, and transportation except where predominantly local in character) even though such cases may involve labor disputes affecting commerce, unless the provision of the State or Territorial statute applicable to the determination of such cases by such agency is inconsistent with the corresponding provision of this subchapter or has received a construction inconsistent therewith.

**(b) Complaint and notice of hearing; answer; court rules of evidence inapplicable**

Whenever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the Board, or any agent or agency designated by the Board for such purposes, shall have power to issue and cause to be served upon such person a complaint stating the charges in that respect, and containing a notice of hearing before the Board or a member thereof, or before a designated agent or agency, at a place therein fixed, not less than five days after the serving of said complaint: *Provided*, That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made, unless the person aggrieved thereby was prevented from filing such charge by reason of service in the armed forces, in which event the six-month period shall be computed from the day of his discharge. Any such complaint may be amended by the member, agent, or agency conducting the hearing or the Board in its discretion at any time prior to the issuance of an order based thereon. The person so complained of shall have the right to file an answer to the original or amended complaint and to appear in person or otherwise and give testimony at the place and time fixed in the complaint. In the discretion of the member, agent, or agency conducting the hearing or the Board, any other person may be allowed to intervene in the said proceeding and to present testimony. Any such proceeding shall, so far as practicable, be conducted in accordance with the rules of evidence applicable in the district courts of the United States under the rules of civil procedure for the district courts of the United States, adopted by the Supreme Court of the United States pursuant to section 2072 of Title 28.

**(c) Reduction of testimony to writing; findings and orders of Board**

Add. 10

The testimony taken by such member, agent, or agency or the Board shall be reduced to writing and filed with the Board. Thereafter, in its discretion, the Board upon notice may take further testimony or hear argument. If upon the preponderance of the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter: *Provided,* That where an order directs reinstatement of an employee, back pay may be required of the employer or labor organization, as the case may be, responsible for the discrimination suffered by him: *And provided further,* That in determining whether a complaint shall issue alleging a violation of subsection (a)(1) or (a)(2) of section 158 of this title, and in deciding such cases, the same regulations and rules of decision shall apply irrespective of whether or not the labor organization affected is affiliated with a labor organization national or international in scope. Such order may further require such person to make reports from time to time showing the extent to which it has complied with the order. If upon the preponderance of the testimony taken the Board shall not be of the opinion that the person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue an order dismissing the said complaint. No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause. In case the evidence is presented before a member of the Board, or before an administrative law judge or judges thereof, such member, or such judge or judges as the case may be, shall issue and cause to be served on the parties to the proceeding a proposed report, together with a recommended order, which shall be filed with the Board, and if no exceptions are filed within twenty days after service thereof upon such parties, or within such further period as the Board may authorize, such recommended order shall become the order of the Board and become effective as therein prescribed.

**(d) Modification of findings or orders prior to filing record in court**

Until the record in a case shall have been filed in a court, as hereinafter provided, the Board may at any time upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it.

**(e) Petition to court for enforcement of order; proceedings; review of judgment**

The Board shall have power to petition any court of appeals of the United States, or if all the courts of appeals to which application may be made are in vacation, any district court of the United States, within any circuit or district, respectively, wherein the unfair labor practice in question occurred or wherein such person resides or transacts business, for the enforcement of such order and for appropriate temporary relief or restraining order, and shall file in the court the record in the proceedings, as provided in section 2112 of Title 28. Upon the filing of such petition, the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction of the proceeding and of the question determined therein, and shall have power to grant such temporary relief or restraining order as it deems just and proper, and to make and enter a decree enforcing, modifying and enforcing as so modified, or setting aside in whole or in part the order of the Board. No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances. The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive. If either party shall apply to the court for leave to adduce additional evidence and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearing before the Board, its member, agent, or agency, the court may order such additional evidence to be taken before the Board, its member, agent, or agency, and to be made a part of the record. The Board may modify its findings as to the facts, or make new findings by reason of additional evidence so taken and filed, and it shall file such modified or new findings, which findings with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive, and shall file its recommendations, if any, for the modification or setting aside of its original order. Upon the filing of the record with it the

Add. 11

jurisdiction of the court shall be exclusive and its judgment and decree shall be final, except that the same shall be subject to review by the appropriate United States court of appeals if application was made to the district court as hereinabove provided, and by the Supreme Court of the United States upon writ of certiorari or certification as provided in section 1254 of Title 28.

**(f) Review of final order of Board on petition to court**

Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia, by filing in such a court a written petition praying that the order of the Board be modified or set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the Board, and thereupon the aggrieved party shall file in the court the record in the proceeding, certified by the Board, as provided in section 2112 of Title 28. Upon the filing of such petition, the court shall proceed in the same manner as in the case of an application by the Board under subsection (e), and shall have the same jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper, and in like manner to make and enter a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board; the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall in like manner be conclusive.

**(g) Institution of court proceedings as stay of Board's order**

The commencement of proceedings under subsection (e) or (f) of this section shall not, unless specifically ordered by the court, operate as a stay of the Board's order.

**(h) Jurisdiction of courts unaffected by limitations prescribed in chapter 6 of this title**

When granting appropriate temporary relief or a restraining order, or making and entering a decree enforcing, modifying, and enforcing as so modified or setting aside in whole or in part an order of the Board, as provided in this section, the jurisdiction of courts sitting in equity shall not be limited by chapter 6 of this title.

**(i) Repealed. Pub.L. 98-620, Title IV, § 402**(31), Nov. 8, 1984, 98 Stat. 3360

**(j) Injunctions**

The Board shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

**(k) Hearings on jurisdictional strikes**

Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(D) of section 158(b) of this title, the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the

dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed.

**(l) Boycotts and strikes to force recognition of uncertified labor organizations; injunctions; notice; service of process**

Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(A), (B), or (C) of section 158(b) of this title, or section 158(e) of this title or section 158(b)(7) of this title, the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any United States district court within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law: *Provided further*, That no temporary restraining order shall be issued without notice unless a petition alleges that substantial and irreparable injury to the charging party will be unavoidable and such temporary restraining order shall be effective for no longer than five days and will become void at the expiration of such period: *Provided further*, That such officer or regional attorney shall not apply for any restraining order under section 158(b)(7) of this title if a charge against the employer under section 158(a)(2) of this title has been filed and after the preliminary investigation, he has reasonable cause to believe that such charge is true and that a complaint should issue. Upon filing of any such petition the courts shall cause notice thereof to be served upon any person involved in the charge and such person, including the charging party, shall be given an opportunity to appear by counsel and present any relevant testimony: *Provided further*, That for the purposes of this subsection district courts shall be deemed to have jurisdiction of a labor organization (1) in the district in which such organization maintains its principal office, or (2) in any district in which its duly authorized officers or agents are engaged in promoting or protecting the interests of employee members. The service of legal process upon such officer or agent shall constitute service upon the labor organization and make such organization a party to the suit. In situations where such relief is appropriate the procedure specified herein shall apply to charges with respect to section 158(b)(4)(D) of this title.

**(m) Priority of cases**

Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of subsection (a)(3) or (b)(2) of section 158 of this title, such charge shall be given priority over all other cases except cases of like character in the office where it is filed or to which it is referred and cases given priority under subsection (l).

**CREDIT(S)**

(July 5, 1935, c. 372, § 10, 49 Stat. 453; June 23, 1947, c. 120, Title I, § 101, 61 Stat. 146; June 25, 1948, c. 646, § 32(a), (b), 62 Stat. 991; May 24, 1949, c. 139, § 127, 63 Stat. 107; Pub.L. 85-791, § 13, Aug. 28, 1958, 72 Stat. 945; Pub.L. 86-257, Title VII, §§ 704(d), 706, Sept. 14, 1959, 73 Stat. 544; Pub.L. 95-251, § 3, Mar. 27, 1978, 92 Stat. 184; Pub.L. 98-620, Title IV, § 402(31), Nov. 8, 1984, 98 Stat. 3360.)

Notes of Decisions (5879)

29 U.S.C.A. § 160, 29 USCA § 160
Current through P.L. 117-327. Some statute sections may be more current, see credits for details.

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Laws of Puerto Rico Annotated Currentness
  Title 29. Labor
    Part I. Labor Provisions Generally
      Chapter 11A. Puerto Rico Minimum Wage, Vacation and Sick Leave Act

29 L.P.R.A. § 250e

§ 250e Use of uniforms

Every employer who requires his/her employees to use a uniform shall have to defray the expense of their acquisition. Under no circumstances shall the employee be required in any way, to contribute directly or indirectly to assume, totally or partially, the expense of acquiring said uniforms. Pursuant to this section, every health services employer is required to assume the obligation to furnish uniforms, or their equivalent in money, to the nurses, as well as to laboratory and radiology technicians, therapists, or other technical health professionals whose practice requires the use of uniforms.

**Credits**

-July 27, 1998, No. 180, § 7; July 30, 1999, No. 192, § 1; renumbered as § 5 on Sept. 21, 2021, No. 47, § 4.05.

**HISTORY**

**Amendments**

**-1999.**

Act 1999 added the third sentence and made other minor lexical changes.

**Statement of motives.**

July 30, 1999, No. 192.

29 L.P.R.A. § 250e, PR ST T. 29 § 250e

Current through all acts translated by the Translation Office of the Puerto Rico Government through the 2011 Legislative Session and various acts from 2012 to the present. Please note that the official translations come in irregular intervals and not necessarily in act number order. Appendix IV (Rules of Evidence for the General Court of Justice, 1979) of Title 32 has been replaced by Appendix VI (Rules of Evidence for the General Court of Justice, 2009) of Title 32 by Order of the Supreme Court dated Sept. 4, 2009, but the official translation is not yet available. Also, the official translations of Appendices XII through XXII of Title 3, which encompass various reorganization plans of the Puerto Rico Government and promulgated in 2010 through 2012, have not yet been received. For all missing translations, please consult the Spanish version.

LAWS OF PUERTO RICO ANNOTATED - Copyright; 1955-2022 by the Secretary of State of Puerto Rico and LEXISNEXIS of Puerto Rico, Inc. All rights reserved.

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.                                    1

Add. 15